IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 97,296

STATE OF KANSAS,
*Appellee*,

v.

SIDNEY J. GLEASON,
*Appellant.*

SYLLABUS BY THE COURT

1.

This court's decision in *State v. Gleason*, 299 Kan. 1127, 329 P.3d 1102 (2014) (*Gleason I*), *rev'd and remanded sub nom. Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016), was based on jurisprudence founded on the Eighth Amendment to the United States Constitution as it relates to the holding regarding instructions on mitigating circumstances. No state law questions were presented as to that holding.

2.

K.S.A. 2015 Supp. 21-6619(b) mandates that the Kansas Supreme Court shall consider any errors asserted in the review and appeal of a death penalty case.

3.

The Eighth Amendment to the United States Constitution does not require the district court to instruct a capital jury that mitigating circumstances need not be proven beyond a reasonable doubt.

1

4.

K.S.A. 21-4624(e) provides greater protection to a death-eligible defendant than that required by the federal Constitution. Accordingly, a capital jury in Kansas must be instructed that mitigating circumstances need not be proven beyond a reasonable doubt.

5.

A party cannot raise a challenge to a statute's constitutionality if the claimed defect does not apply to that party.

6.

Under § 9 of the Kansas Constitution Bill of Rights, challenges asserting that a punishment is categorically disproportionate are limited to term-of-years sentences.

7.

A criminal defendant does not have a liberty interest in having a jury instructed in accord with an overruled interpretation of a provision of law.

8.

Although certain guilt-phase errors do not individually or collectively require reversal of a conviction, those errors may be so compelling that they affect a sentencing determination when the same jury has decided both guilt and sentence.

9.

A claim of cumulative error in the penalty phase of a death penalty appeal is reviewed using a two-step analysis. First, we determine if any guilt-phase errors must be considered in conjunction with the penalty-phase errors. Second, we must decide if the total cumulative effect of the errors, viewed in the light of the record as a whole, had no reasonable possibility of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. The overwhelming nature of the evidence

is a factor to be considered in making this determination, but its impact is limited. The question is not what effect the error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review.

Appeal from Barton District Court; HANNELORE KITTS, judge. Opinion on remand filed February 3, 2017. Affirmed.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, and *Meryl Carver-Allmond* and *Rebecca E. Woodman*, of the same office, were on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: This case returns after the United States Supreme Court reversed and remanded our penalty-phase determination in *State v. Gleason*, 299 Kan. 1127, 329 P.3d 1102 (2014) (*Gleason I*), *rev'd and remanded sub nom. Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). That requires us to address the unresolved penalty-phase issues from Sidney J. Gleason's capital murder trial. As explained, Gleason is not entitled to relief on those issues, so we affirm his death sentence.

FACTUAL AND PROCEDURAL BACKGROUND

A jury convicted Gleason of capital murder for the killings of Darren Wornkey and his girlfriend, Mikiala "Miki" Martinez, as well as premeditated first-degree murder for killing Wornkey, aggravated kidnapping, aggravated robbery, and criminal possession of a firearm. In a separate penalty phase, the same jury sentenced Gleason to death for the capital offense. See K.S.A. 21-3439(a)(6) (defining capital murder as the "intentional and

premediated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct").

These crimes were more fully detailed in our earlier decision. See *Gleason I*, 299 Kan. at 1134-46. As explained there, Gleason and Damien Thompson were involved with Martinez in an aggravated robbery. Fearing that Martinez was talking with law enforcement about the robbery, Gleason and Thompson tried to intimidate her. In doing so, Gleason shot and killed Wornkey. A short time later, Thompson shot and killed Martinez. After their arrests, Thompson agreed to plead guilty to the first-degree murder of Martinez, disclose the location of her body, and testify against Gleason. In return, the State agreed to recommend certain sentencing terms and dismiss the remaining charges against Thompson. This resulted in Thompson receiving a sentence of life imprisonment with no possibility of parole for 25 years.

Gleason appealed his convictions and death sentence. A divided court affirmed Gleason's convictions of capital murder, aggravated kidnapping, aggravated robbery, and criminal possession of a firearm. 299 Kan. at 1184. Also by a divided vote, the court vacated Gleason's death sentence, holding that the Eighth Amendment to the United States Constitution required informing Gleason's jury that mitigating circumstances need not be proven beyond a reasonable doubt. 299 Kan. at 1197.

On certiorari to the United States Supreme Court, the Court reversed and remanded with one dissent. The Court held the Eighth Amendment did not require Kansas juries in a death penalty case to be advised the defendant was not required to prove mitigating circumstances beyond a reasonable doubt. *Carr*, 136 S. Ct. at 642 ("[O]ur case law does not require capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt.'"). Gleason's case returned to this court for further proceedings because there were

4

unresolved penalty-phase issues. See 136 S. Ct. at 646 (remanding case); *Gleason I*, 299 Kan. at 1199 (declining to address Gleason's remaining challenges to sentence after concluding jury instruction issue was dispositive).

Shortly after that, Gleason filed a motion, asking us to affirm our original holding about the burden-of-proof instruction for mitigating factors on the basis of state law. He also moved for supplemental briefing. The State opposed both motions. We invited further briefing at the parties' option. We also asked if additional oral argument was necessary.

Gleason submitted a supplemental brief on some unresolved issues and adopted by reference his earlier arguments as to others. The State advised more briefing was unnecessary, arguing there was no new controlling authority since *Gleason I*. The State also opposed further oral argument. Gleason did not explicitly request oral argument or contend it would be beneficial. He only stated he would "welcome the opportunity" to address the court.

It should be noted we considered *sua sponte* revisiting the trial errors rejected by the *Gleason I* majority, particularly the claim that the district court violated Gleason's constitutional right to confront the witnesses against him and the related question whether the district court erred by not declaring a mistrial after a witness was declared unavailable to testify at trial. This *sua sponte* consideration occurred in the context of addressing the dissents' arguments below. Ultimately, a majority of the court determined revisiting these questions was inappropriate given Gleason's failure on remand to request reconsideration and because no exception to the law of the case doctrine was applicable. See *State v. Kleypas*, 305 Kan. 224, 245, 382 P.3d 373 (2016) (*Kleypas II*) (applying law of the case doctrine in death penalty case and noting only three exceptions to that doctrine: [1] a subsequent trial produces substantially different evidence, [2] a controlling authority has

5

made a contrary decision regarding the law applicable to the issues, or [3] the prior decision was clearly erroneous and would work a manifest injustice).

Accordingly, the outstanding issues are: (1) whether it was reversible error under state law not to instruct jurors that mitigating circumstances need to be proven only to the individual juror's satisfaction and not beyond a reasonable doubt; (2) whether the death penalty is unconstitutionally disproportionate under § 9 of the Kansas Constitution Bill of Rights as applied to an offender category to which Gleason claims to belong, namely "non-triggerman" accomplices; (3) whether Gleason's death sentence is unconstitutionally disproportionate in comparison to his accomplice's sentence; (4) whether Gleason's death sentence is contrary to the aiding and abetting statute, K.S.A. 21-3205; (5) whether the district court erred in giving a pre-*Kleypas I* instruction about the weighing equation under K.S.A. 21-4624(e); (6) whether the district court committed clear error when instructing the jury about the sentence Gleason would receive if the jury decided not to impose the death penalty; (7) whether the penalty-phase verdict forms protected Gleason's right to be free from double jeopardy; and (8) whether any cumulative error requires reversal of the death sentence.

After conducting our own research and fully considering the original and supplemental briefs, we conclude further oral argument is unnecessary. As explained, we hold the remaining issues do not warrant reversal or remand.

THE JURY INSTRUCTION ON MITIGATION

In his motion for a ruling under state law, Gleason argued we should affirm our prior holding that the district court's failure to provide an affirmative instruction that mitigating factors need not be proven beyond a reasonable doubt required vacating his death sentence. But a motion requesting a specific holding from this court is unusual. And to the extent Gleason advanced a new claim in this motion, he chose the "wrong

procedural vehicle to obtain his requested relief." *State v. Cheever*, 304 Kan. 866, 875-76, 375 P.3d 979 (2016) (*Cheever II*) (motion practice cannot be used as end run around rules of appellate procedure). Accordingly, we deny Gleason's motion, although that does not end the question.

We note Gleason's motion was coupled with a motion for supplemental briefing, which we granted. And K.S.A. 2015 Supp. 21-6619(b) requires this court in death penalty cases to "consider . . . any errors asserted in the review and appeal" and authorizes us to notice unassigned errors if doing so serves the "ends of justice." So based on the relevant statute and the unique circumstances of this case, we will treat Gleason's arguments as if they had been raised in his supplemental brief. See *Cheever II*, 304 Kan. at 876-77 (holding that although Cheever chose "the wrong procedural vehicle to obtain his requested relief" the issue would be considered because this is a death penalty case and K.S.A. 2015 Supp. 21-6619 applies).

Gleason first argues the state law references in our 2014 decision were central to the outcome, overturning his death sentence due to the absence of a burden of proof explanation for the mitigation instruction. He contends *Gleason I*'s holding on this point was based "on issues unique to Kansas state law," rather than the Eighth Amendment. The upshot, he asserts, is that the United States Supreme Court's decision reversing *Gleason I* is not binding and that we are free to ignore it.

But this disregards both Gleason's previous arguments in *Gleason I* and what we said when deciding the case. Gleason's original brief declared:  "[T]he specific question is whether the instruction prevented the jury from giving proper consideration to mitigating circumstances, *as is required by the Eighth and Fourteenth Amendments*." (Emphasis added.) Similarly, Gleason's conclusion repeated that the jury was precluded "from giving proper consideration to mitigating circumstances in determining the appropriate sentence for Sidney Gleason, *in violation of the Eighth and Fourteenth Amendments*." (Emphasis

7

added.) Without question, Gleason did not present a state law basis in his original briefing when arguing for reversal based on the mitigation instruction.

Just as plainly, there is no credence to his contention that our 2014 decision was grounded in state law. We rejected this identical argument in *Cheever II*. We held *Gleason I* and two other cases addressing the same issue "were framed as federal constitutional claims." 304 Kan. at 883. Likewise, we reject Gleason's contention now that our rationale rested on state law. The United States Supreme Court's decision cannot be ignored or treated as nonbinding. It is part of the law of this case with respect to Gleason's federal constitutional claim. See 304 Kan. at 878 (holding *Kansas v. Carr* forecloses any relief under Eighth Amendment on failure to provide a burden of proof instruction to accompany the mitigating circumstances instruction).

Gleason argues in the alternative that, even if our original holding was based on Eighth Amendment jurisprudence, state law nonetheless requires an affirmative instruction informing a penalty-phase jury that mitigating factors need not be proven beyond a reasonable doubt. We agree. We recently considered the issue and held the trial court's failure to give such an instruction was error under state law. See *Cheever II*, 304 Kan. at 886. In that case, we first noted K.S.A. 21-4624(e) states:

> "'If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced to life without the possibility of parole. The jury, if its verdict is a unanimous recommendation of a sentence of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstances which it found beyond a reasonable doubt. If, after a reasonable time for deliberation, the jury is unable to reach a verdict, the judge shall

8

dismiss the jury and impose a sentence of life without the possibility of parole and shall commit the defendant to the custody of the secretary of corrections.'" 304 Kan. at 879.

We further observed: "K.S.A. 21-4624(e) provides greater protection to a death-eligible defendant than that required by the federal Constitution, *i.e*., the defendant has only a burden of production in establishing mitigating circumstances." 304 Kan. at 883. And then we concluded:

> "In enacting K.S.A. 21-4624(e), the Kansas Legislature endowed capital defendants with protection above that of the federal constitutional floor with respect to the burden of proof to establish mitigating circumstances. This greater protection is a matter of state law outside the purview of the United States Supreme Court." 304 Kan. at 883-84.

We then applied our well known multi-step process for considering claims of jury instruction error when there was no objection. *Cheever II*, 304 Kan. at 884-85 (two-part test); see K.S.A. 22-3414(3) (no party may assert instructional error unless that party objected before the jury retires, stating the grounds for the objection, unless the instruction or failure to give it is clearly erroneous); *State v. Robinson*, 303 Kan. 11, 282, 363 P.3d 875 (2015) (holding "two-part test" requires appellate court to determine [1] whether subject instruction legally and factually appropriate and [2] assess whether court is firmly convinced jury would have reached different verdict had instruction error not occurred); *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012) (clarifying how review of jury instruction issues fits within the structure of the typical appellate process).

We held an instruction that mitigating circumstances need not be proven beyond a reasonable doubt was both legally and factually appropriate, so it was error for the trial court not to give it. 304 Kan. at 885-86. The instruction was legally appropriate because of K.S.A. 21-4624(e)'s greater protections. 304 Kan. at 885 ("By necessary implication, [K.S.A. 21-4624(e)] evidences the legislature's intent that a capital penalty phase jury be

9

instructed that mitigating circumstances need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt."). And it was factually appropriate because Cheever offered evidence of mitigating factors and because "mercy itself may be considered a mitigating factor . . . ." 304 Kan. at 885. We then proceeded to the next analytical step—deciding whether failure to give the instruction was reversible, *i.e.*, clearly erroneous, because Cheever did not request the instruction or object to the one given. 304 Kan. at 886.

The same analysis used in *Cheever II* leading up to the determination of error under the first analytical step is equally applicable in Gleason's case. We hold that an instruction on the burden of proof explaining that mitigating circumstances need not be proven beyond a reasonable doubt was legally and factually appropriate in Gleason's case under state law. Accordingly, it was error for the district court not to give the instruction. And because Gleason did not request the instruction, we next consider whether the failure to instruct was clearly erroneous, *i.e.*, whether we are firmly convinced the jury would have reached a different verdict absent the error. As explained, we hold there was no clear error.

The *Gleason I* court reviewed the sufficiency of the evidence supporting the aggravating factors the jury found in imposing the death penalty. See K.S.A. 2015 Supp. 21-6619(c) (providing supreme court "shall determine . . . whether the evidence supports the findings that an aggravating circumstance or circumstances existed"). The State alleged four statutory aggravating circumstances, each of which the jury found:  (1) Gleason was previously convicted of a felony in which he inflicted great bodily harm, disfigurement, or death on another; (2) Gleason knowingly or purposely killed or created a great risk of death to more than one person; (3) Gleason committed the crime in order to avoid or prevent his lawful arrest or prosecution; and (4) Martinez was killed because she was a prospective witness against Gleason. See K.S.A. 21-4625 (listing aggravating circumstances).

10

The standard of review the *Gleason I* court applied was whether, after studying all the evidence and viewing it in the light most favorable to the prosecution, the court was convinced a rational factfinder could have found the existence of the alleged aggravating circumstance beyond a reasonable doubt. 299 Kan. at 1189. The court concluded sufficient evidence supported all four aggravating circumstances, explaining:

"Regarding the avoid arrest and victim witness aggravators, the evidence established that Gleason, Thompson, Galindo, Fulton, and Martinez robbed Elliott on February 12, 2004. After the robbery, Gleason and Thompson, collectively and individually, threatened their accomplices to discourage them from talking to the police about the robbery. Later, Gleason and Thompson learned that Martinez and Fulton had talked to the police and, 9 days after the robbery, Gleason and Thompson killed Martinez and Wornkey. We are convinced that a rational factfinder could have found beyond a reasonable doubt both that Gleason killed Martinez to avoid arrest or prosecution for the Elliott robbery and that Martinez was killed because she was a prospective witness against Gleason regarding the Elliott robbery. Further, we note that because Martinez witnessed Wornkey's murder, it also would have been reasonable for the jury to conclude that Gleason killed Martinez to avoid arrest or prosecution for killing Wornkey and that Martinez was killed because she was a prospective witness against Gleason regarding Wornkey's murder.

"Gleason challenges the sufficiency of the evidence to support the risk of death aggravator by incorporating his previous argument regarding the State's alleged failure to prove the murders of Wornkey and Martinez were committed as 'part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct.' We rejected that argument in the guilt phase portion of this opinion because the State's evidence clearly established the requisite connection between the two murders. This same evidence supports the jury's finding that Gleason 'knowingly or purposely killed . . . more than one person.' See K.S.A. 21-4625(2).

11

"Finally, the evidence clearly supports that Gleason previously had been convicted of a felony in which he inflicted great bodily harm, disfigurement, dismemberment, or death on another. See K.S.A. 21-4625(1). Agent Latham testified Gleason was convicted of attempted voluntary manslaughter in 2001 and that at the time of Gleason's trial in this case, the victim of that crime still had a bullet lodged in his chest, had significant scars from three gunshot wounds, and had a surgical scar from the removal of a bullet from his hip." 299 Kan. at 1189-90.

Against the State's alleged statutory aggravating circumstances, Gleason claimed as mitigating circumstances: (1) His capacity to appreciate the criminality of his conduct was impaired; (2) he was relatively young—24 years old at the time of the crime; (3) the public would be adequately protected if he were given a term of imprisonment; (4) he had an accomplice who significantly participated in planning and committing the crimes; (5) his accomplice received only a life sentence with eligibility for parole in 25 years; (6) he lacked contact with his mother in his early years because she was in jail; (7) he and his siblings were all in jail at the time of sentencing; (8) he was obedient and an excellent student when he lived with his great aunt; and (9) his family loved him.

On remand, Gleason argues we must reverse his death sentence because we cannot presume an instructional error of this type "did not sway the vote of a single juror." Therefore, the argument continues, we cannot be firmly convinced the verdict would have been the same had the proper instruction been given.

But our task on appeal is stated differently. To find clear error, the court must be firmly convinced the jury *would have reached a different verdict* absent the instructional error. This inquiry requires us to review and consider the complete record on appeal to determine the error's impact. *Cheever II*, 304 Kan. at 886-87. We have done that in Gleason's cases by independently reviewing the record on appeal in full, including the penalty-phase proceedings. We found nothing suggesting there would have been a different verdict had the jury been instructed properly.

12

Gleason's mother, great aunt, brothers, and childhood pastor testified to the mitigating circumstances. There was little, if any, dispute about the facts establishing their existence. As to this mitigating evidence, the district court instructed the jury:

"You may further consider as a mitigating circumstance any other aspect of the defendant's character, background or record, and any other aspect of the offense which was presented in either the guilt or penalty phase which you find may serve as a basis for imposing a sentence less than death. Each of you must consider every mitigating circumstance found to exist."

The court also told the jury, "The appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed."

Moreover, the parties' closing arguments further dispel the notion that we should be firmly convinced the jury would have reached a different verdict absent the instructional error. The State repeatedly told the jury it would be each juror's "individual choice" to decide whether mitigating factors exist based upon "any evidence" to support a particular factor. The State never suggested mitigation had to be proven beyond a reasonable doubt or even under the lower preponderance-of-the-evidence standard. To the contrary, the State repetitively spoke about each mitigation factor alleged by Gleason and asked, "Did you hear any evidence about that?" or, "Can you find that one to exist based on the evidence?"

In some instances, the State simply conceded a factor's existence, such as Thompson's involvement with the crimes. The State also admitted Thompson received a life sentence with parole eligibility no earlier than 25 years from the date of sentencing. Indeed, a fair review of the State's closing shows little, if any, dispute about the existence

13

of Gleason's mitigating factors and not a hint of argument that Gleason had failed to demonstrate any factor's existence. Instead, the State focused on what weight those factors should be given in light of the aggravators—and there is no claim of error in that regard.

Likewise, in Gleason's closing, his defense counsel told the jurors:

"You're also told in [Instruction 7] that mitigators do not have to be proven unanimously. *You all have to consider them, but if you believe something is a mitigator, it goes on your scale, it doesn't matter if anyone else places it on theirs. Likewise, you independently weigh those mitigators.*" (Emphasis added.)

Defense counsel further explained, "Mitigators are anything in your independent moral assessment whether it's on this list in Instruction 7 or not." And he later added:

"Any one of you who says no, I think that there's mitigation, be it mercy, be it something on the list, be it something of your own that outweighs aggravation guarantees Sidney life. It's minority rule in that regard. There's a presumption of life."

The penalty-phase closing arguments by both the State and the defense did exactly what they were supposed to do—they helped the jury understand the evidence and apply the law. See PIK Crim. 3d 56.00-D (2003 Supp.). Based on the complete record, we conclude there simply is no clear error requiring us to vacate Gleason's death sentence based on the defective jury instruction.

We note the concurrence disagrees with the analytical approach just explained and would instead have simply determined the mitigation instruction as originally given was legally appropriate, *i.e.*, there was no error. The concurrence's premise is that we were wrong in *Cheever II* to find a state law error and now equally wrong following that

14

caselaw here. The concurrence essentially argues the United States Supreme Court laid to rest the claim of error in *Kansas v. Carr*, 136 S. Ct. at 643-44, even though that decision "is not technically binding in law on this court in the context of state law." (Slip. op. at 35 [Stegall, J., concurring].) Some observations are appropriate in response.

First, it is unexplained why this court should apply a federal constitutional standard to what is exclusively a state law claim. Neither our legislature nor this court are subordinate to a federal test that merely denotes the federal constitutional floor when state law requires more. The federal test advanced by the concurrence is not the exclusive way to identify error in the penalty phase, and it is inapplicable to this state law issue because we are considering the absence of a legally appropriate instruction, not simply whether the instructions as given were ambiguous under the Eighth Amendment.

Second, under our state law analysis, there is a difference between whether an instruction is legally appropriate and whether prejudice occurred from an instructional error. In *Cheever II*, this court held that an instruction on the burden of proof that explained mitigating circumstances need not be proven beyond a reasonable doubt was legally appropriate. This determination was based on our statutory analysis of K.S.A. 21-4624(e) in conjunction with the other instructions given, caselaw precedent, and legislative inaction following our decisions on the necessity of affirmatively instructing the jury on the burden of proof for mitigating circumstances. See *Cheever II*, 304 Kan. at 883-85.

Third, turning to the harmless inquiry itself, the quotations referred to in the concurrence from the United States Supreme Court's *Kansas v. Carr*, 136 S. Ct. at 643-44, decision and the dissent in *Gleason I*, 299 Kan. at 1213 (Biles, J., dissenting), are actually analogous to the state law harmless prong, even though they were made originally in the "reasonable likelihood" context of the Eighth Amendment. And our decision to reject Gleason's prejudice claims on the mitigation instruction question finds

15

those same quotations instructive in determining that the state law error was harmless. We simply apply their wisdom at the proper place in the state law analysis.

Finally, the concurrence questions whether *Cheever II*'s state law discussion of the mitigation instruction might be seen as judicial pique in reaction to the earlier reversal by the United States Supreme Court on the federal Eighth Amendment issue. But as explained by the *Cheever II* court, it was Cheever who raised this state law issue for the first time after remand from the United States Supreme Court—he just did it improperly. See *Cheever II*, 304 Kan. at 874-76. Given that, the *Cheever II* court simply followed K.S.A. 2015 Supp. 21-6619(b) (The court "shall consider the question of sentence as well as any errors asserted in the review and appeal and shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby."). This is the same statutory authority we have exercised in Gleason's case to dispose of this same issue.

§ 9 OF THE KANSAS CONSTITUTION BILL OF RIGHTS

Gleason claims his death sentence is unconstitutional under § 9 of the Kansas Constitution Bill of Rights for two reasons. First, he contends § 9 categorically prohibits imposing the death penalty against "a non-triggerman accomplice who has been found guilty of capital murder based on aiding and abetting" because death is "an unconstitutionally disproportionate punishment" for that category of offenders. Second, he argues his death sentence is "an unconstitutionally disproportionate punishment" under § 9 in comparison to the hard 25 sentence received by his accomplice, Thompson, who engaged in the same conduct as Gleason.

The State initially contends these questions are not properly preserved, but in pressing this contention it ignores the special review provisions applicable to death penalty appeals, as discussed above. See K.S.A. 2015 Supp. 21-6619(b) (providing this

16

court must review every error asserted in a death penalty appeal). We will not address these provisions again. Accordingly, we reject this preservation argument.

*Standard of review*

Whether the Kansas death penalty statute is constitutional under § 9, as applied to a certain category of offenders, is a question of law over which this court exercises unlimited review. See *State v. Dull*, 302 Kan. 32, 40, 351 P.3d 641 (2015); see also *State v. Gomez*, 290 Kan. 858, 863-66, 235 P.3d 1203 (2010) (holding defendant's proportionality claim under the Eighth Amendment presents questions of law); *State v. Scott*, 286 Kan. 54, 92, 183 P.3d 801 (2008) ("[T]he constitutionality of a statute . . . raises a question of law over which [the court] exercise[s] an unlimited standard of review."), *overruled on other grounds State v. Dunn*, 304 Kan. 773, 807-11, 375 P.3d 332 (2016).

*The non-triggerman accomplice argument*

Gleason urges this court to "interpret § 9's cruel or unusual punishment clause to prohibit the death penalty for an accomplice such as Sidney Gleason, convicted of capital murder based on aiding and abetting Damien Thompson's killing of Miki Martinez." In other words, Gleason casts himself as only a non-triggerman accomplice. But that is not really the proper category to place him in, so he would not have standing to assert that claim. See *Cheever II*, 304 Kan. at 888 (party cannot challenge a statute's constitutionality when the claimed defect does not apply to that party).

Gleason was actually convicted of capital murder based on the intentional and premeditated killing of two victims, in which he was the principal for one killing and a non-triggerman accomplice in the second. But such a narrow categorical definition would be inconsistent with the United States Supreme Court's approach to categorizing

17

defendants "by broad characteristics such as those who committed their crimes before the age of 18 or whose intellectual functioning is in a low range." *State v. Mossman*, 294 Kan. 901, 928, 281 P.3d 153 (2012) (citing *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 [2005], and *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 [2002]); see *Enmund v. Florida*, 458 U.S. 782, 797, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (adopting broad categorical rule that a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death).

Gleason's narrower class of offender based on the facts of his crime "is so case-specific it seems to obliterate the distinction between the two categories of analysis: (1) a case-specific analysis that 'would allow courts to account for factual differences between cases' and (2) a categorical analysis." *Mossman*, 294 Kan. at 928 (quoting *Graham v. Florida*, 560 U.S. 48, 77, 130 S. Ct. 2011, 176 L. Ed. 2d 825 [2010]); see *State v. Florentin*, 297 Kan. 594, Syl. ¶ 3, 303 P.3d 263 (2013) (defendant cannot argue sentence categorically disproportionate in violation of Eighth Amendment by creating fact-specific categories relating to nature of offender and details of crime).

The United States Supreme Court's approach to categorizing defendants by broad characteristics when assessing categorical challenges is a sound one, and we adopt that approach when considering categorical challenges under § 9. Gleason's case-specific argument would too narrowly define his class, and he does not belong to the broader class of non-triggerman accomplices, for which a categorical analysis might be appropriate.

*As-applied challenge under § 9*

Gleason next argues his death sentence is unconstitutional under § 9 as a disproportionate punishment when compared to the hard 25 sentence Thompson received

18

after pleading guilty. Simply stated, Gleason seeks a comparative proportionality review of his death sentence.

But "neither the Kansas Constitution, the Kansas death penalty statutes, nor Kansas case law requires that a defendant's sentence be subjected to a proportionality review which compares the defendant's sentence with those imposed on other Kansas defendants for the same or similar crimes." *State v. Kleypas*, 272 Kan. 894, 1033, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *abrogated in part Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Gleason argues that we should overrule *Kleypas I* as to this point, but we have recently affirmed it on its merits. See *State v. Kleypas*, 305 Kan. 224, 338-39, 382 P.3d 373 (2016) (*Kleypas II*).

Gleason further suggests this court has recently reaffirmed the availability of comparative proportionality review in noncapital cases under § 9. But he supports this by citing cases dealing with the three-part test from *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). That test does not apply when the method of punishment rather than the term of years is challenged as cruel or unusual. *Kleypas II*, 305 Kan. at 338-39; *Mossman*, 294 Kan. at 909; see also *Kleypas I*, 272 Kan. at 1031-33; *State v. Scott*, 265 Kan. 1, 8-9, 961 P.2d 667 (1998) (declining to apply the three-prong test set forth in *Freeman*). Gleason is challenging the method of his punishment for capital murder— death—as compared to the length of Thompson's sentence for first-degree murder—25 to life. That is not the type of comparison contemplated under *Freeman*. See 223 Kan. at 367 (developing "three techniques" to consider "[i]n determining whether the length of a sentence offends the constitutional prohibition against cruel punishment").

*Kleypas I* makes clear that a comparative proportionality review of a death sentence is not required under the federal or state constitutions or under state law, and Gleason offers no new arguments as to why this court should reverse the position taken in

19

that case. We decline to consider Gleason's request for a comparative proportionality review of his death sentence.

## AIDING AND ABETTING STATUTE

Gleason next claims there is no statutory authority for imposing a death sentence against an aider and abettor. Specifically, he contends this court has consistently misinterpreted the aiding and abetting statute, K.S.A. 21-3205, as allowing an aider and abettor to be punished in the same manner as a principal. He further argues that because K.S.A. 21-3205 does not expressly authorize an aider and abettor to be punished in the same manner as a principal, the aggravating circumstances of K.S.A. 21-4625 do not apply when a defendant is convicted of capital murder under a theory of aiding and abetting.

Like Gleason's § 9 challenges, these arguments rest entirely upon his mischaracterization of his capital murder conviction. He was not "convicted of capital murder on an aiding and abetting theory." He was convicted of capital murder because he committed first-degree, premeditated murder when he shot and killed Wornkey and then committed first-degree, premeditated murder when he aided and abetted Thompson in killing Martinez. Both murders were sufficiently related to constitute the crime of capital murder under K.S.A. 21-3439(a)(6) (intentionally and with premeditation killing more than one person in same or related transactions). Gleason's capital murder conviction actually rests upon the jury's determination that he committed two related, intentional, premeditated murders, only one of which is predicated on an aiding-and-abetting theory.

Since the factual underpinnings of Gleason's argument are missing, we reject this claim as meritless.

20

Over Gleason's objection, the district court instructed the jury, in part, "If you find unanimously beyond a reasonable doubt that one or more aggravating circumstances exists and that they are not outweighed by any mitigating circumstances found to exist, then you shall impose a sentence of death."

Gleason claims this instruction was legally incorrect because the district court failed to modify the instruction in accordance with this court's interpretation of K.S.A. 21-4624(e) as set forth in *Kleypas I*. There, the court held the statute violated the Eighth Amendment because it mandated a death sentence if the jury found the aggravating and mitigating factors to be in equipoise. *Kleypas I*, 272 Kan. 894, Syl. ¶ 45.

The problem with Gleason's argument is that the instruction given by the district court is consistent with the statutory language of K.S.A. 21-4624(e), and that statute was held constitutional by the United States Supreme Court after Gleason's trial. See *Marsh*, 548 U.S. at 181. In other words, even though the instruction was incorrect at the time of Gleason's trial based on then-controlling authority, two months later that instruction was determined to be correct by the United States Supreme Court. Accordingly, we cannot hold that the instruction was legally inappropriate. Further, there is no claim the instruction created juror confusion or prevented the jury from considering relevant mitigating evidence.

Gleason also argues he had a liberty interest in having the jury instructed consistent with *Kleypas I*, and the district court's failure to do so violated his right to due process under the Fourteenth Amendment to the United States Constitution. He relies on *Hicks v. Oklahoma,* 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980). When addressing this argument in *Kleypas II*, we stated:

21

"The liberty interest recognized by the *Hicks* Court was the right to have the jury determine a defendant's punishment and to be able to exercise its full discretion. Kleypas essentially attempts to create a liberty interest in having the jury instructed in accord with an overruled interpretation of a provision of law. But that is not the holding in *Hicks*.

"Here, Kleypas was sentenced by the jury in accord with the statute applicable to his offense at the time he committed it. See *State v. Keel*, 302 Kan. 560, 586-87, 357 P.3d 251 (2015) (penalty parameters for a crime are fixed on the date the offense was committed), *cert. denied* 136 S. Ct. 865 (2016); see also *Griffith v. Kentucky*, 479 U.S. 314, 327, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final"); *Gaudina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004) (Kansas follows "the same rule for finality [for purposes of the retroactive applicability of a new rule] set forth in *Griffith*."). And, according to the holding in *Marsh*, the instruction fulfilled Kleypas' liberty interest in having the jury exercise the full discretion allowed by law." *Kleypas II*, 305 Kan. at 295-96.

We similarly conclude the sentencing procedure did not deprive Gleason of any liberty interest.

## ADVISING JURY OF ALTERNATIVE SENTENCES

Gleason next claims the district court gave a "confusing and inaccurate" instruction about the sentences he could receive if the jury decided not to impose the death penalty. Gleason contends flaws in the instruction were exacerbated when the instruction was read with other instructions and the verdict forms. He did not bring any of these alleged flaws to the district court's attention at the time of trial.

On appeal, Gleason focuses on a portion of Instruction 11. It provided: "If, at the conclusion of your deliberations, the jury *finds that the mitigating circumstances*

22

*outweigh the aggravating circumstances*, then the Court will sentence Sidney Gleason pursuant to the Kansas Sentencing Guidelines Act . . . ." (Emphasis added.) The instruction then informed the jury about possible noncapital sentences the court could impose.

Gleason reads the italicized portion of the instruction in isolation and quite literally. He argues no instruction and no verdict form provided an option for the jury to make an affirmative finding that the mitigating circumstances outweighed the aggravating circumstances. According to Gleason, the jury was left to speculate about the noncapital sentence he would receive if not sentenced to death. In addition, Gleason asserts the instruction (1) risked leading the jury to believe it had to be unanimous in finding mitigating circumstances outweighed aggravating circumstances for the noncapital sentences to be imposed, and (2) created a reasonable likelihood the instruction prevented the jurors from giving meaningful effect to Gleason's asserted mitigating circumstance that a term of imprisonment would be sufficient to defend and protect the public's safety.

Gleason recognizes this court's standard of review in the absence of an objection to a jury instruction is generally clear error. See K.S.A. 22-3414(3). And the State asserts this standard of review applies because Gleason failed to lodge an objection to the instruction on the grounds he now asserts. But citing *Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990), Gleason contends a "heightened review" applies to alleged instructional claims of error occurring during the penalty phase of a death penalty case.

We recently clarified how *Boyde* intersects our multi-step process for considering claims of jury instruction error. We noted that under *Boyde*, when a claim is made that jury instructions impermissibly restrict a jury's consideration of evidence relevant to mitigating factors in the penalty phase of a death penalty case, the proper inquiry as to the

23

instruction's legal appropriateness under the Eighth Amendment is whether there is a reasonable likelihood the jury applied the challenged instruction in a way that prevented consideration of constitutionally relevant evidence. *Kleypas II*¸ 305 Kan. 224, Syl. ¶ 24. We observed further the *Boyde* test is not a harmless error test. Instead, it determines whether constitutional error occurred when the jury was given an ambiguous instruction that it might have interpreted to prevent consideration of constitutionally relevant evidence. *Kleypas II*, 305 Kan. at 304. We then more fully discussed how the *Boyde* test fit within the structure of this state's established jury instruction analysis.

Drawing from *Calderon v. Coleman*, 525 U.S. 141, 146-47, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998), we articulated the following steps: (1) A reviewing court must determine if the jury instruction was ambiguous and whether that ambiguity opened the possibility of misleading the jury; (2) the court must apply the *Boyde* test to decide if there was a reasonable likelihood the jury understood the instruction in a manner that was misleading to the jury; (3) if the court finds a reasonable likelihood, it must determine whether the instruction, as so understood, was unconstitutional as applied to the defendant; and (4) if so, the court must apply the appropriate harmless error test depending on whether a proper request or objection was made. *Kleypas II*, 305 Kan. at 304-06.

In other words, at step four, if a death penalty defendant failed to request or object to an instruction, the court must apply the clearly erroneous standard for harmless error and determine whether it is firmly convinced the jury would have reached a different verdict had the instruction error not occurred. And the party claiming there was a clearly erroneous instruction would have the burden to establish the degree of prejudice necessary for reversal. *Kleypas II*, 305 Kan. at 306.

In this case, we need not labor over the analysis step by step. Instead, we simply recognize a more accurate instruction would have told the jury that "[i]f, at the conclusion

24

of your deliberations, *the jury is unable to reach a unanimous verdict sentencing Sidney Gleason to death*, then the Court will sentence Sidney Gleason pursuant to the Kansas Sentencing Guidelines Act as follows . . . ." Given that, we may assume—without deciding—that the first three steps outlined above resolve in Gleason's favor. This brings us to the fourth step where we must determine if we are firmly convinced the jury would have reached a different verdict had the instruction error not occurred. We do this based on our review of the entire record.

Although we are willing to assume instructional error, we do not assume each basis Gleason asserts for potential juror confusion. First, the instructions and verdict forms cannot fairly be read to have confused the jurors with respect to the noncapital sentences Gleason faced if the jury failed to sentence him to death. The instruction informed the jury of the possible sentences Gleason faced under the Kansas Sentencing Guidelines Act, and the jury was told that if it was "unable to reach a unanimous verdict sentencing Sidney Gleason to death," he would be "sentenced by the Court as otherwise provided by law." See *Boyde*, 494 U.S. at 378, 380-81 (instructions must be read as a whole; jurors "do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might"). Second, there is simply no possibility the jury could have read the instruction to require jurors to be unanimous with respect to the weight to afford the mitigating circumstances.

This leaves Gleason's contention that the instruction prevented the jury from giving meaningful effect to his asserted mitigating circumstance that "[a] term of imprisonment is sufficient to defend and protect the people's safety from Sidney Gleason." This argument fails as well.

Even if we accept for the sake of argument this assertion is true, we are not convinced the jury would have reached a different verdict had it considered Gleason's assertion. The jury was instructed that Gleason faced a minimum of 25 years of

25

imprisonment were it not to impose the death penalty, so it was keenly aware Gleason would not be a threat to the public for at least two and a half decades. Nevertheless, the jury returned a verdict of death. Moreover, future dangerousness was not central to Gleason's mitigation defense because he focused on his family and upbringing. Finally, we note again the jury found the existence of all four aggravating circumstances alleged by the State. Accordingly, we conclude the assumed instructional error does not require reversal under federal or state law.

PENALTY-PHASE VERDICT FORMS

When this case was first heard, Gleason claimed the verdict forms provided to the jury in the penalty phase were not adequate to protect his right to be free from double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution and interpreted by *Sattazahn v. Pennsylvania*, 537 U.S. 101, 108, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003). We determined in *Gleason I* this issue was not ripe for appellate review. *State v. Gleason*, 299 Kan. 1127, 1198, 329 P.3d 1102 (2014) (*Gleason I*); see also *State v. Burnett*, 293 Kan. 840, 849-50, 270 P.3d 1115 (2012) (issue is not ripe until defendant's capital conviction is overturned and the State attempts to punish defendant again for the same crime). Because the prerequisites for this claim have not occurred, Gleason's double jeopardy argument is still not ripe for review.

CUMULATIVE ERROR DURING PENALTY PHASE

Our review of a claim of cumulative error in the penalty phase involves a two-step analysis. *Kleypas II*, 305 Kan. at 346. First, we must determine whether any of the guilt-phase errors must be considered in conjunction with penalty-phase errors. See *State v. Cheever*, 304 Kan. 866, 902-03, 375 P.3d 979 (2016) (*Cheever II*) ("[C]ertain guilt-phase errors . . . could be of such a nature that they impact the sentencing determination when the same jury decides both guilt and sentence."). Second, we must determine whether the

26

total cumulative effect of the errors, viewed in the light of the record as a whole, had no reasonable possibility of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. *Kleypas II*, 305 Kan. 224, Syl. ¶ 37. In reaching this determination, the overwhelming nature of the evidence is a factor to be considered, but its impact is limited. "The question before the court is not what effect the error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review." *Kleypas II*, 305 Kan. 224, Syl. ¶ 37.

The *Gleason I* court previously identified three unrelated "procedural" guilt-phase errors: (1) the district court's instruction that another trial would be a burden on both sides; (2) witnesses testifying in jail clothes; and (3) the district court's failure to answer a jury question in open court with Gleason present. None can be reasonably seen to carry through to the penalty phase, and Gleason makes no argument that they did. 299 Kan. at 1184.

As to penalty-phase errors, we have identified one error relating to the mitigating circumstances burden of proof under state law and we have assumed another with respect to Gleason's claim on Instruction 11. We have addressed both errors under the applicable standard of review and found no clear error.

In considering their cumulative effect, we note both were instructional errors. But we do not perceive they had the effect of intensifying one another. The first involved the district court's failure to give an instruction regarding the burden of proof for mitigating circumstances. The second, which we assumed, involved Gleason's claim that Instruction 11 prevented the jury from considering an asserted mitigating circumstance. Neither of these intersect.

27

Logically, our generous assumption in Gleason's favor that the jury failed to consider one of his mitigating circumstances in total precludes a finding that he could have suffered further prejudice from the failure to instruct the jury that that mitigating circumstance need not be proven beyond a reasonable doubt. Accordingly, we conclude beyond a reasonable doubt that any cumulative effect of these two instructional errors in the penalty phase had no reasonable possibility of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances.

CONCLUSION

For the foregoing reasons, we affirm Gleason's death sentence.

Affirmed.

\*\*\*

STEGALL, J., concurring:  I concur with the outcome of today's decision. But in reaching the correct result, the majority insists on perpetuating an error in our capital sentencing caselaw that has already been rejected and purportedly corrected by the United States Supreme Court in *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 643, 646, 193 L. Ed. 2d 535 (2016). The post-*Carr* reemergence of our instructional rule requiring capital juries in Kansas to be affirmatively "instructed that mitigating circumstances need not be proved beyond a reasonable doubt" first appeared last year in *State v. Cheever*, 304 Kan. 866, Syl. ¶ 5, 375 P.3d 979 (2016) (*Cheever II*) (Stegall, J., not participating). Both *Cheever II* and this case (*Gleason II*) are wrong on this issue, and I take the opportunity here to register my dissent from Syllabus paragraph 4 above and Syllabus paragraph 5 in *Cheever II*.

28

The history of this issue in Kansas is robust. As recited by the majority opinions in both *Cheever II* and *Gleason II* above, this court has repeatedly held "that the failure of the district court to instruct the jury that mitigating circumstances need not be prove[d] beyond a reasonable doubt required vacating each appellant's death sentence under the Eighth Amendment" to the United States Constitution. *Cheever II*, 304 Kan. at 874 (reciting the holdings of *State v. Carr*, 300 Kan. 1, 303, 331 P.3d 544 [2014], *State v. Carr*, 300 Kan. 340, 369-70, 329 P.3d 1195 [2014], and *State v. Gleason*, 299 Kan. 1127, 1196-97, 329 P.3d 1102 [2014] [*Gleason I*]). But all three of those decisions were subsequently reversed by the United States Supreme Court on this precise issue. *Carr*, 136 S. Ct. at 643-44, 646.

In her lone dissent in *Carr*, Justice Sonia M. Sotomayor suggested that the United States Supreme Court had improvidently granted review of this court's decisions in those cases because "nobody disputes that the State of Kansas could, as a matter of state law, reach the same outcome." 136 S. Ct. at 649 (Sotomayor, J., dissenting). Subsequently, in *Cheever II*, this court accepted that implicit invitation to side-step the effect of the Supreme Court's ruling in *Carr* and found—for the first time—a mandate for the instructional rule in state law as opposed to the Eighth Amendment. 304 Kan. at 885. A result, we noted, that was safely "outside the purview of the United States Supreme Court." 304 Kan. at 884.

How this state law requirement was discovered only after the Supreme Court pulled the Eighth Amendment rug out from under this court is unexplained. The mystery is compounded by the fact that the *Cheever II* court explicitly reached the state law question as an "unassigned error" reachable to serve "the ends of justice." 304 Kan. at 876-77. If the state law requirement announced in *Cheever II* has existed all along, and if the ends of justice demanded announcing and protecting this requirement even when the issue was not properly preserved by the parties, one may legitimately wonder—what took so long?

29

But the reasonable inference that *Cheever II*'s rationale grounded exclusively in state law went unnoticed and unstated in our prior caselaw because no one thought there *was* a state law basis for the rule does not, by itself, mean *Cheever II* is wrong. Other inferences could be reasonably drawn—*i.e.*, the issue was never raised as a state law claim by the parties—and it is better to get the law right late than never get it right at all.

Nonetheless, the weakness of the majority's reasoning on this issue, coming as it does on the heels of a reversal by the United States Supreme Court, leaves the impression that "the majority apparently starts with what it views as a palatable result and works backward to articulate a substitute rationale for demonstrably infirm precedent." *Miller v. Johnson*, 295 Kan. 636, 690, 289 P.3d 1098 (2012) (Beier, J., concurring in part and dissenting in part). It may not always be possible for courts to avoid casting a cynical misimpression, but we should be more cognizant of the possibility and should take greater pains to avoid it. Of course, a judge's primary shield against cynicism is the unassailable strength of sound legal reasoning. So it is to the majority's reasoning I now turn.

In this case, Gleason's jury was given the pre-2008 pattern instruction as follows:

"'The determination of what are mitigating circumstances is for you as jurors to decide under the facts and circumstances of this case. Mitigating circumstances are to be determined by each individual juror . . . . The same mitigating circumstances do not need to be found by all members of the jury in order to be considered by an individual juror in arriving at his or her sentencing decision.

. . . .

"'. . . Each of you must consider every mitigating circumstance found to exist.'"
*Gleason I*, 299 Kan. at 1194 (quoting PIK Crim. 3d 56.00-D [2001 Supp.]).

30

Cheever's jury was likewise given the pre-2008 PIK Crim. 3d 56.00-D (2003 Supp.) instruction. *State v. Cheever*, 295 Kan. 229, 266, 284 P.3d 1007 (2012) (*Cheever I*). Similar instructional language was given to the *Carr* jury. See 300 Kan. at 302-03.

Compare these instructions with the statutory standard as set forth in K.S.A. 21-4624(e):

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death . . . ."  K.S.A. 21-4624(e).

Clearly, the instructions at issue mimic the statutory requirement that mitigating factors must be considered by individual jurors when they are "found to exist."  It is important to ask why, then, are these instructions erroneous as a matter of state law? More specifically, what is the state law basis for the *Cheever II* rule that it is error for a capital jury in Kansas to be instructed according to the plain language of K.S.A. 21-4624(e)?

No one disputes that the plain and unambiguous language of K.S.A. 21-4624(e) requires the State to prove aggravating factors beyond a reasonable doubt but imposes a mere burden of production on capital defendants to show mitigating circumstances. No one disputes that the Kansas statute provides more favorable evidentiary rules for capital defendants than the Eighth Amendment requires. The *Cheever II* court's focus—repeated here in *Gleason II*—on these two noncontroversial conclusions distracts attention from the real question at the heart of all of these cases:  When a capital jury is instructed according to the language of the statute—*i.e.,* "'The State has the burden to prove beyond a reasonable doubt that there are one or more aggravating circumstances and that they are

31

not outweighed by any mitigating circumstances found to exist,'" *Cheever II*, 304 Kan. at 877 (quoting *Carr*, 136 S. Ct. at 643)—is there any reasonable likelihood the jury will be confused and fail to consider any relevant mitigating circumstances?

The Supreme Court's "reasonable likelihood" test asks a similar question: "[W]hether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). Applying *Boyde* in *Gleason I* we framed our decision this way: "[W]e conclude a reasonable likelihood exists that the jury applied the mitigating circumstances instruction in a manner precluding individual jurors from properly considering relevant mitigating evidence as required by the Eighth Amendment." *Gleason I*, 299 Kan. at 1197; see *Carr*, 300 Kan. at 369-70; *Carr*, 300 Kan. at 302-03 (holding that "[w]hen nothing in the instructions mentions any burden other than 'beyond a reasonable doubt,' jurors may be 'prevented from giving meaningful effect or a reasoned moral response to' mitigating evidence, implicating a defendant's right to individualized sentencing under the Eighth Amendment").

Today's decision, like the *Cheever II* decision before it, concludes that even though the United States Supreme Court has made it abundantly clear that the Eighth Amendment does not require juries to consider mitigating circumstances not proved "beyond a reasonable doubt"—our statute does require it. Thus, "K.S.A. 21-4624(e) provides greater protection to a death-eligible defendant than required by the federal Constitution." *Cheever II*, 304 Kan. 866, Syl. ¶ 5. But the maneuver of substituting the requirements of K.S.A. 21-4624(e) for the requirements of the Eighth Amendment in our legal calculus should not fundamentally alter the substantive purpose of our review—to decide whether a jury could have been misled into not considering certain mitigating circumstances that, by law, should have been considered. As this court put it in *Gleason I* when answering that question in the affirmative, "Gleason's jury was left to speculate as

32

to the correct burden of proof for mitigating circumstances, and reasonable jurors might have believed they could not consider mitigating circumstances not proven beyond a reasonable doubt." 299 Kan. at 1197.

Shifting the locus of the legal requirement from federal constitutional law to state statutory law certainly changes which court has the "final say" on the matter. But the *source* of the law being applied should be irrelevant to a determination of whether the specific instruction adequately communicated the content of the law to the jury such that we have confidence, as a reviewing court, that the jury understood and applied the correct legal standard. Put another way, *Boyde*'s "reasonable likelihood" test should apply whenever a capital defendant asserts that an instruction fails to adequately communicate the proper legal standard (whether constitutional *or* statutory) concerning the consideration of mitigating circumstances.

The majority asserts there is no reason to apply this test to questions of state law. On this point, our recent decision in *State v. Kleypas*, 305 Kan. 224, 382 P.3d 373 (2016), is instructive. Kleypas asserted a constitutional claim that the instructions his jurors received prevented them from considering the constitutionally relevant mitigating circumstance of mercy. We applied our traditional "legally and factually appropriate" rubric when analyzing the claim and held:

> "[W]hen a claim is made in the penalty phase of a death penalty case that jury instructions impermissibly restrict a jury's consideration of evidence relevant to mitigating factors and, therefore, violate the Eighth Amendment to the United States Constitution, the proper inquiry for legal appropriateness is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. This test is not a harmless error test. Rather it is the test for determining, in the first instance, whether an instructional error occurred." *Kleypas*, 305 Kan. 224, Syl. ¶ 24.

33

I am unable to conjure any compelling reason (the majority does not offer one) to abandon the reasonable likelihood test for legal appropriateness just because we are talking about *statutorily* relevant mitigating circumstances as opposed to *constitutionally* relevant mitigating circumstances. Simply restyling an identical constitutional claim as a state law claim—as Gleason does here—should not result in shifting the "reasonable likelihood" inquiry from the error analysis to the prejudice analysis as the majority purports to have done.

Given this, the proper question before us now must be:  Is there a reasonable likelihood that the jury as instructed in this case applied the mitigating circumstances instruction so as to preclude individual jurors from properly considering relevant mitigating evidence *as required by K.S.A. 21-4624(e)*? The majority opinions in *Cheever II* and here in *Gleason II* skip this question entirely. This is unsurprising given that the Supreme Court already effectively answered that question in a way that fatally undermines the outcomes we have reached.

In its opinion, the Supreme Court held that *even if* the Eighth Amendment contained the same requirements as K.S.A. 21-4624(e), the instructions given in this case would not have caused reasonable jurors to believe they could not consider mitigating circumstances not proved beyond a reasonable doubt.

> "The juxtaposition of aggravating and mitigating circumstances, so goes the argument, caused the jury to speculate that mitigating circumstances must also be proved beyond a reasonable doubt. [Citation omitted.] It seems to us quite the opposite. The instruction makes clear that both the existence of aggravating circumstances and the conclusion that they outweigh mitigating circumstances must be proved beyond a reasonable doubt; mitigating circumstances themselves, on the other hand, must merely be 'found to exist.' . . . 'Found to exist' certainly does not suggest proof beyond a reasonable doubt. . . . Not once do the instructions say that defense counsel bears the burden of proving the facts constituting a mitigating circumstance beyond a reasonable doubt—nor would that make

34

much sense, since one of the mitigating circumstances is (curiously) 'mercy,' which simply is not a factual determination.

"We reject the Kansas Supreme Court's decision that jurors were 'left to speculate as to the correct burden of proof for mitigating circumstances.' [Citation omitted.] For the reasons we have described, no juror would reasonably have speculated that mitigating circumstances must be proved by any particular standard, let alone beyond a reasonable doubt. . . . Jurors would not have misunderstood these instructions to prevent their consideration of constitutionally relevant evidence." *Carr*, 136 S. Ct. at 643-44.

While this discussion is not technically binding in law on this court in the context of state law, it should be binding in logic and reason. If jurors "would not have misunderstood these instructions to prevent their consideration of constitutionally relevant evidence," 136 S. Ct. at 644, how can we justifiably conclude that jurors *would* misunderstand these instructions to prevent their consideration of *statutorily* relevant evidence? The distinction makes no sense. The majority here, as in *Cheever II*, cannot answer this question and so it does not ask it.

Remarkably, the Supreme Court was not the first to arrive at this conclusion. The author of today's decision dissented in *Gleason I* on this very point, arguing persuasively that there is "nothing in the instructions from which to conclude the jury was bewildered by them, or that there is a reasonable likelihood the jurors applied them in a way that prevented their full consideration of Gleason's mitigating factors evidence." *Gleason I*, 299 Kan. at 1213 (Biles, J., dissenting). I agree with Justice Dan Biles on this issue— albeit not today.

Moreover, there has never been any suggestion that the language of K.S.A. 21-4624(e) is ambiguous or unclear. To the contrary, its meaning is plain and is clearly communicated through the legislature's choice of ordinary words with ordinary meanings. See *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016) (explaining that absent an

35

ambiguity, the plain meaning of the words chosen by the legislature will control and courts will not add words to the law). There may be circumstances in which a statutory rule for jury deliberation is ambiguous, thus requiring a judicially crafted explanatory instruction to be given to a jury charged with applying such a statute. But I suggest that when a statute's meaning is plain on its face, reading that same language to a jury in the form of an instruction cannot cause the jury to misunderstand the legal standard embodied in the statute.

Finally, today's majority attempts to buttress its decision by suggesting that it is doing nothing more than imposing a "legally appropriate" instruction under state law. See slip op. at 9. But the instruction *as given* was legally appropriate, and the majority does nothing to dispel this conclusion. Indeed, the only plausible suggestion as to it being inappropriate came in *Gleason I*, *Cheever I*, and *Carr—viz.*, that it would lead jurors astray and prevent them from considering mitigating circumstances "found to exist." See K.S.A. 21-4624(e). As just demonstrated, that suggestion has been thoroughly discredited. Just because the instruction the majority demands is a correct statement of the law does not mean it is error not to give it. For example, an instruction that told the jury "mitigating circumstances need not be proved by clear and convincing evidence" is likewise a correct statement of the law. Is the fact that Gleason's jury was not given this instruction *also* an "unassigned" error? Accepting the majority's analysis would force one to answer in the affirmative, but such a result is plainly absurd.

What remains? Only the reassurance of the majority that the "error" has been found harmless. But what of future cases in which this precedent will be applied in circumstances that demand reversal for such an instructional "error"—*e.g.,* in cases not applying a clear error standard of review? See, *e.g.*, *Gleason II*, slip op. at 40 (Johnson, J., dissenting) (arguing that this instructional error would be reversible error were it not for the clear error standard which should not apply in capital cases). Our harmlessness

36

tests should not be applied as a backstop to prevent legally questionable rulings from producing unjust results.

The mitigating circumstances instruction given in this case was not confusing and contained the correct legal standard. That should end our inquiry. I would find no error in the instruction as given.

***

LUCKERT, J., concurring in part and dissenting in part: I write separately to explain that nothing in this decision changes my separate opinion in *State v. Gleason*, 299 Kan. 1127, 1199-1210, 329 P.3d 1102 (2014) (*Gleason I*), *rev'd and remanded sub nom. Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016), in which I concurred in part and dissented in part. I still conclude: (1) The district court's admission of Damien Thompson's preliminary hearing testimony violated Sidney Gleason's constitutional right to confront witnesses; (2) the district court abused its discretion when it denied Gleason's motion for a mistrial; (3) these errors require reversal of Gleason's convictions for capital murder, aggravated kidnapping, and criminal possession of a firearm and a remand for a new trial on these charges; (4) the errors did not impact Gleason's conviction for aggravated robbery and that conviction should be affirmed; and (5) a new sentencing proceeding should be conducted on the aggravated robbery conviction and convictions, if any, that result from a retrial.

Separately considering the issues discussed by the majority in today's opinion, I concur with the majority's reasoning. That means I would not reverse Gleason's capital sentence based solely on any of today's issues. Nevertheless, for the reasons discussed in my separate opinion in *Gleason I*, I dissent from the majority's conclusion that Gleason's capital sentence should be affirmed. Because guilt-phase errors entitle Gleason to a new trial on the capital murder charge, his capital murder sentence should be vacated and his

case remanded to the district court for a new trial. In addition, I have no doubt Thompson's testimony prejudiced Gleason's right to a fair penalty-phase trial.

In seeking the death penalty, the State argued Gleason knowingly or purposely killed or created a great risk of death to more than one person. Thompson's testimony provided direct evidence—indeed, arguably the only direct evidence—of this aggravator. Specifically, Thompson testified that Gleason shot Darren Wornkey. And, although Thompson confessed to shooting Mikiala "Miki" Martinez, he also testified that Gleason had walked toward Martinez with "his arm . . . extended outward with the gun in hand" and with the intent to shoot Martinez before Thompson intervened and killed her himself. Thompson also testified that Gleason watched while Thompson strangled and shot Martinez. In light of this testimony, I conclude there exists a strong possibility the erroneous admission of this evidence contributed to the jury verdict sentencing Gleason to death.

BEIER, J., joins in the foregoing concurring and dissenting opinion.

***

JOHNSON, J., dissenting:  I dissent on multiple grounds. First, I agree with that part of Justice Luckert's separate opinion determining that Gleason's capital murder conviction should have been reversed for a new trial based upon the additional trial errors of unconstitutionally admitting Damien Thompson's preliminary hearing testimony and denying Gleason's motion for a mistrial. Likewise, I, too, have no doubt that Thompson's testimony prejudiced Gleason's right to a fair penalty-phase trial, thereby rendering the death sentence unreliable.

The majority engages in an analysis of whether errors during the guilt phase of the trial impacted the sentencing phase, but it chooses not to have the current court make the

38

determination of the guilt-phase errors to be used in that calculus. Instead, it invokes the prudential doctrines of law of the case and preservation to restrict the analysis to only those guilt-phase trial errors previously found by a minority of the currently sitting court, *i.e.*, only three members of the current majority rejected the trial errors asserted in Justice Luckert's dissent, which three members of the current court have asserted. Ironically, the majority relies on *State v. Kleypas*, 305 Kan. 224, 245, 382 P.3d 373 (2016) (*Kleypas II*), to justify its use of the discretionary law of the case doctrine. But that case also set forth the heightened scrutiny rule which is constitutionally required (not prudential) in death penalty cases, to-wit:

> "This court has, in several cases, noted that issues in a death penalty review are subject to a heightened reliability standard. See, *e.g.*, *Carr*, 300 Kan. at 284 (recognizing need for heightened reliability); *State v. Scott*, 286 Kan. 54, 76, 183 P.3d 801 (2008) (same); *State v. Green*, 283 Kan. 531, 545, 153 P.3d 1216 (2007) ('[I]n the context of a capital sentence, this court has required a heightened degree of reliability.'); *Marsh*, 278 Kan. at 525 ('[T]here is a heightened scrutiny of trial proceedings in a capital case.'); *Kleypas I*, 272 Kan. at 1036 (observing 'heightened reliability requirements' apply to capital sentencing under federal and state constitutions).

> "A sentence of death is different from any other punishment, and accordingly there is an increased need for reliability in the determination that death is the appropriate sentence. See *Beck*, 447 U.S. at 637-38 (recognizing that a death sentence is a '"different kind of punishment from any other which may be imposed in this country . . . in both its severity and its finality"' [quoting *Gardner v. Florida*, 430 U.S. 349, 357-58, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)]; court has duty to set aside procedures that undermine the reliability of the jury's determination)." *Kleypas II*, 305 Kan. at 274-75.

The majority's refusal to have the whole court look at all of the alleged trial errors in the course of completing the penalty-phase analyses in this ongoing death penalty case strikes me as a procedure that undermines the reliability of the appropriateness of the

death penalty. It looks more like hidden scrutiny than heightened scrutiny. Certainly, a prudential doctrine should not trump a constitutionally required rule.

Further, I disagree with the majority's treatment of the jury instruction on mitigation, just as I did in the case upon which the majority relies. See *State v. Cheever*, 304 Kan. 866, 906, 375 P.3d 979 (Johnson, J., dissenting). "As the dissent in *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 650, 193 L. Ed. 2d 535 (2016) (Sotomayor, J., dissenting), recognized, our reversal in *Gleason* rested in part 'on some lower courts' failure to give instructions reflecting the Kansas Supreme Court's "repeated recognition of the required content"' of the mitigating circumstances jury instruction." *Cheever*, 304 Kan. at 905. It has been a state-court rule since *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001) (*Kleypas I*), not solely a federal constitutional question. The reason for that state rule is that if a jury is to be charged with the grave responsibility of determining whether to recommend a death sentence, it should be told explicitly what it is to decide and how each juror is to go about reaching his or her decision. Anything less fails the constitutionally required heightened reliability standard.

Moreover, in a death penalty case, K.S.A. 2015 Supp. 21-6619(b) requires that this court "consider . . . any errors asserted in the review and appeal." That statute by its clear terms trumps the ordinary preservation rule for instructional error set forth in K.S.A. 22-3414(3). Accordingly, the clearly erroneous reversibility standard that we employ under K.S.A. 22-3414(3) in noncapital cases should have no place in our review of the jury instructions given to a death penalty jury, which are always reviewable without preservation.

Finally, I would go even further and permanently vacate the death sentence, principally based on the prohibition against inflicting "cruel or unusual punishment" set forth in § 9 of the Kansas Constitution Bill of Rights. See *State v. Robinson*, 303 Kan. 11,

40

351, 363 P.3d 875 (2015) (Johnson, J., dissenting), *cert. denied* 137 S. Ct. 164 (2016), *disapproved of on other grounds by Cheever*, 304 Kan. at 902. In that regard, I reiterate the rationale I previously borrowed from the dissent in *Glossip v. Gross,* 576 U.S. ___, 135 S. Ct. 2726, 2755-77, 192 L. Ed. 2d 761 (2015) (Breyer, J., joined by Ginsburg, J., dissenting). *Robinson*, 303 Kan. at 351.